NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 200061-U

NO. 4-20-0061

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 18, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.Y., a Minor | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Sangamon County |
| v. | ) | No. 15JA24 |
| Alexis B., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Knecht and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding the trial court's fitness and best-interest findings were not against the manifest weight of the evidence.

¶ 2    In January 2020, the trial court terminated the parental rights of respondent, Alexis B., as to her minor child, A.Y. (born October 18, 2012). On appeal, respondent argues the trial court's fitness and best-interest determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 3                                  I. BACKGROUND

¶ 4                              A. Procedural History

¶ 5    On February 10, 2015, the State filed a petition for adjudication of wardship, alleging A.Y. was a neglected and abused minor pursuant to sections 2-3(1) and 2-3(2) of the

Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1), (2) (West 2014)), in that (1) A.Y. was not receiving the proper care and supervision necessary for his well-being based on respondent's failure to abide by a safety plan imposed by the Illinois Department of Children and Family Services (DCFS) (count I); (2) A.Y's environment was injurious to his welfare as evidenced by burns on his right hand and arm (count II); and (3) A.Y. had been physically abused by respondent (count III). Following a shelter-care hearing on the same date, the trial court placed A.Y. in the temporary custody and guardianship of DCFS.

¶ 6        On July 8, 2015, the trial court conducted an adjudicatory hearing. Respondent stipulated to count I as alleged in the State's petition. The court accepted the stipulation and found A.Y. was a neglected minor. The State dismissed the remaining two counts. Following an August 19, 2015, dispositional hearing, the trial court entered a written order adjudicating A.Y. a ward of the court and placing custody and guardianship with DCFS. On October 19, 2015, respondent filed a petition to revoke DCFS's guardianship of A.Y., alleging she had completed the service plan imposed by DCFS. In October 2016, A.Y. was returned to respondent's custody while guardianship remained with DCFS.

¶ 7        In April 2017, DCFS received a hotline call regarding suspected abuse of A.Y. Respondent was indicated for (1) "[s]exual exploitation" and (2) "[s]ubstantial risk of sexual abuse—sexualized behavior of young child." A.Y. was again removed from respondent's care and put into a familial foster placement with A.Y.'s maternal grandmother, Tasha Kimbrough. However, following an administrative appeal, DCFS determined the allegations of sexual abuse to be unfounded.

¶ 8        On May 3, 2017, a grand jury indicted respondent for aggravated battery of a child (720 ILCS 5/12-3.05(b)(2) (West 2016)) in Sangamon County case No. 17-CF-390, alleging that

on December 17, 2014, respondent knowingly and without legal justification caused bodily harm or disfigurement to A.Y. in that she burned A.Y. with an iron.

¶ 9 On September 30, 2018, DCFS opened another investigation after a business owner found A.Y. wandering around the parking lot of MassageLuXe "alone and crying" during an unsupervised visit with respondent. Respondent was reportedly inside of Dew Chili Parlor gambling and eating with A.Y.'s younger sister while A.Y. remained alone in the car. DCFS terminated unsupervised visits between respondent and A.Y. following the incident.

¶ 10 Following a December 2018 bench trial, the Sangamon County circuit court found respondent guilty of aggravated battery of a child in Sangamon County case No. 17-CF-390. In January 2019, the court sentenced respondent to four years in prison.

¶ 11 On August 1, 2019, the State filed a petition to terminate respondent's parental rights. The State alleged that respondent was an unfit parent in that she (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to A.Y.'s welfare; (2) failed to make reasonable efforts to correct the conditions that were the basis for the removal of A.Y. within any nine-month period after an adjudication of neglect, specifically October 8, 2017, to July 8, 2018; (3) failed to make reasonable progress toward the return of A.Y. within any nine-month period after an adjudication of neglect, specifically October 8, 2017, to July 8, 2018; and (4) was depraved in that she had been criminally convicted of aggravated battery of a child within five years of the State's filing of the petition.

¶ 12 On September 10, 2019, the State filed a supplement to its petition to terminate respondent's parental rights. In the supplement, the State alleged an additional four grounds of unfitness: (1) respondent failed to make reasonable efforts to correct the conditions that were the basis for the removal of A.Y. within nine months after an adjudication of neglect, specifically July

8, 2015, to April 8, 2016; (2) she failed to make reasonable efforts to correct the conditions that were the basis for the removal of A.Y. within any nine-month period after an adjudication of neglect, specifically April 8, 2016, to January 8, 2017; (3) she failed to make reasonable progress toward the return of A.Y. to her within nine months after an adjudication of neglect, specifically July 8, 2015, to April 8, 2016; and (4) she failed to make reasonable progress toward the return of A.Y. to her within any nine-month period after an adjudication of neglect, specifically April 8, 2016, to January 8, 2017.

¶ 13                                    B. The Fitness Hearing

¶ 14            On January 17, 2020, the trial court conducted a fitness hearing. At the outset of the hearing, the State informed the court it would only be proceeding on the ground alleging respondent was an unfit parent in that she was depraved under section 1D(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2018)). The State indicated it was reserving the remaining grounds for unfitness alleged in the petition.

¶ 15            Melinda McBride testified she was employed with the Center for Youth and Family Solutions (CYFS) in Springfield, Illinois, and had been A.Y.'s caseworker since March 1, 2019. McBride testified that in February 2015, a case was opened when A.Y. was found with burns to his hands and forearms indicating abuse by respondent. McBride testified respondent was incarcerated in December 2018 in connection with those allegations. The State then asked the court to take judicial notice of respondent's certified judgment of conviction in Sangamon County case No. 17-CF-390 for aggravated battery of a child, which was by stipulation admitted into evidence as People's Exhibit No. 1.

¶ 16            McBride testified that respondent's initial service plan was established sometime in 2015, and required her to attend parenting classes, maintain stable housing and employment,

obtain a substance abuse assessment, and engage in counseling. McBride testified that due to the length of the case, there were approximately nine service plans in place throughout its duration. A.Y. was returned to respondent's care between October 2016 and April 2017.

¶ 17 Following the investigation into the sexual abuse allegations and the subsequent determination that the allegations were unfounded, respondent resumed unsupervised visits with A.Y. Respondent had six unsupervised visits with A.Y. from August 2018 to September 2018, but after the incident in the Dew Chili Parlor parking lot, respondent's visits with A.Y. were supervised. McBride testified she never observed any visits between A.Y. and respondent because respondent had been incarcerated in the Logan Correctional Center since McBride became A.Y.'s caseworker. To her knowledge, respondent had not had any in-person or telephonic visits with A.Y. since her incarceration.

¶ 18 McBride testified her most recent administrative case review with respondent occurred telephonically in August 2019. She rated respondent's progress with the service plan as unsatisfactory due to respondent's incarceration, which prevented her from participating in counseling services and obtaining stable employment.

¶ 19 On cross-examination, McBride testified respondent had been rated as satisfactory with her service plan at several points since A.Y. came into care. Additionally, nothing in respondent's current service plan was related to the December 2014 abuse allegation which led to her aggravated-battery-of-a-child conviction. Rather, the current reason for A.Y. being in care was due to the allegation of neglect following the incident in the parking lot of Dew Chili Parlor. McBride also noted that respondent's service plan included the use of a parenting coach because there appeared to be "bonding" issues between respondent and A.Y. during their visits. McBride testified that there was no evidence of ongoing physical abuse after the incident in December 2014.

¶ 20          On redirect examination, McBride testified that respondent would be required to register as a violent offender against youth. See 730 ILCS 154/1 *et seq.* (West 2018).

¶ 21          Following arguments, the trial court found the State proved by clear and convincing evidence that respondent was depraved. Accordingly, the court found respondent was an unfit parent.

¶ 22                              C. The Best-Interest Hearing

¶ 23          On January 21, 2020, the trial court conducted a best-interest hearing to determine whether to terminate respondent's parental rights.

¶ 24          McBride testified she remained employed with CYFS and was A.Y.'s caseworker. She stated A.Y. was seven years old and had resided with his maternal grandmother, Tasha Kimbrough, since April 2017. A.Y. also resided with Kimbrough from October 2015 to October 2016. In McBride's opinion, A.Y. was making progress in this placement. When describing A.Y., McBride testified as follows: "[A.Y.] is very outgoing. He's very, very creative. He loves comic books, and he excels, he draws comic books and is just very bright in that area. He's musical and just very happy." McBride stated A.Y. was in first grade and was doing well in school. In addition to Kimbrough, A.Y. lived with Kimbrough's daughter, who was in third grade, and three other foster children who were ages three, almost two, and almost one.

¶ 25          McBride testified Kimbrough was willing to adopt A.Y. and that she had observed a sense of attachment between the two. McBride stated, "He very much loves his grandma. Offers to help her out when she—like for instance, when I visit in the mornings and she's trying to get everybody ready for school, he's helping out and asking what he can do to help out with the kids." McBride testified A.Y. had not seen respondent since McBride became his caseworker in March 2019. McBride  never observed any interactions between respondent and A.Y. In McBride's

opinion, it was in A.Y.'s best interest that respondent's parental rights be terminated because he was "in a very good place. He's happy, he's healthy, he's thriving, and it would be very concerning for that to be disrupted."

¶ 26　　　　On cross-examination, McBride again testified that she had not observed any interactions between respondent and A.Y. McBride could not testify regarding any attachment or bonding between the two except as to information she gathered from the case notes. A.Y. had spent approximately half of his life in respondent's care and the other half with Kimbrough. Kimbrough had been willing to adopt A.Y. since the beginning of the case.

¶ 27　　　　McBride believed respondent was scheduled to be released from prison sometime in 2023 but an appeal was pending in her criminal case. McBride testified that even if respondent were released from prison sooner than 2023, her opinion that respondent's parental rights should be terminated would not change.

¶ 28　　　　McBride acknowledged that at various times throughout the case, respondent had been rated as satisfactory in her service plan and had successfully completed parenting classes. McBride was not aware of any expression from A.Y. that he would like to be returned to his mother's care but stated she never asked him about his preferences. McBride testified her opinion that respondent's parental rights should be terminated was based solely on the case history, case notes, and her observations of A.Y. in his current placement.

¶ 29　　　　McBride testified A.Y. was well-bonded with his foster siblings. She stated as follows:

> "[E]very time I'm there, they're playing together. They act silly. [His foster sister] wears cat ears on her headband, and [A.Y.] teases her about that. Today when I was

there during my visit, the youngest was in his crib, and A.Y. was hugging him and kissing him and telling him good morning."

¶ 30 Following arguments by counsel, the trial court found the State proved by a preponderance of the evidence it was in A.Y.'s best interest that respondent's parental rights be terminated. Specifically, the court stated the following:

"In considering the evidence, looking at the factors I'm to consider, the child's—keeping in mind his age and developmental needs, I'm to consider his physical safety and welfare including his food, shelter, health, and clothing. So obviously he does seem to be very well-cared for. The caseworker described him as very happy. Seemed to be doing very well. His needs are certainly being met. He certainly seems to be safe. He's being provided for by grandma. I'm to consider the development of the child's identity as well as the child's background and ties including familial, cultural, and religious.

He is with family. He's with grandma. He has been there a significant period of time. It is probably just about half—it might be a little bit more now actually that he's spent with grandma than with mom during his life. It is just about half with grandma. I am to consider the child's sense of attachments including where the child actually feels love, attachment, and a sense of being valued as opposed to where the adults think that that should be.

He does appear to be attached. He appears to feel loved in the current home. He gets along well with his grandma. He gets along with the other children in the home, the biological daughter of which I guess would be his aunt in the home and the other foster children, he gets along well with them. Don't have any information

that that's not going well. There does again seem to be quite an attachment between the minor and grandmother.

His sense of security. Again, he appears to be secure there and feel[s] secure. As far as sense of familiarity, again, he's been there now, come April of this year, we're now, tomorrow will be February, so come April, he'll have been there three years with this last stint. I'm to consider the continuity of affection for the child. Again, those kind of run in the same thing as far as his almost three years of his seven-year life will have most recently been spent with grandma.

The least disruptive placement alternative. Again, that would seem to be with grandma at this time. His wishes and long-term goals. And I agree, I think at seven, if he had said something on his own, then I would have certainly considered that, but I don't know that it would be appropriate to ask a seven-year-old necessarily what they want. I think it is interesting that while initially he had been asking about mom, that that's not occurring anymore. I'm to consider his community ties, church, school, friends. Again, he's doing well in school.

His need for permanence, his need for stability and continuity of relationship with parent figures as well as sibling and other relatives. The uniqueness of every family and child and the risk attendant with entering and being in substitute care. With those, as far as permanence, it does seem to be the best way at this time to obtain permanence for him would be to allow his adoption. And I understand as far as the bond with mother, I understand there have been some bonding issues, concerns about how they were bonding; they weren't really

communicating, weren't really showing an attachment in the visits that were occurring.

* * *

I believe [A.Y.] does deserve to have permanence. He needs to know where his home is and where he's going to be, where he's going to stay, who it is that's going to for the rest of his minority—who's going to care for him. Grandma has said she's willing to step up to the plate to do that. She wants to have a chance to go into adoption court and do that. So I do at this time terminate the parental rights of [respondent] ***."

¶ 31 This appeal followed. In February 2020, this court affirmed respondent's conviction for aggravated battery of a child in Sangamon County Case No. 17-CF-390. *People v. Brown*, 2020 IL App (4th) 190081-U, ¶ 1 (affirming respondent's conviction but vacating and remanding for the application of day-for-day sentencing credit).

¶ 32                                    II. ANALYSIS

¶ 33 On appeal, respondent argues the trial court's fitness and best-interest determinations were against the manifest weight of the evidence. We address each of these issues in turn.

¶ 34                         A. The Fitness Determination

¶ 35 Respondent first argues the trial court's unfitness determination was against the manifest weight of the evidence because although the State proved she was depraved, she presented clear and convincing evidence of rehabilitation. We disagree.

¶ 36                              1. *Parental Unfitness*

¶ 37        Parental rights may be involuntarily terminated when the trial court finds that a parent is unfit based on grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) and termination is in the child's best interest. *In re J.L.*, 236 Ill. 2d 329, 337-38, 924 N.E.2d 961, 966 (2010). "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349, 830 N.E.2d 508, 514 (2005). "A reviewing court will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011).

¶ 38                                    2. *Depravity*

¶ 39        Here, the trial court determined respondent was unfit in that respondent is depraved under section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2018)). The Illinois Supreme Court has defined depravity as "an inherent deficiency of moral sense and rectitude." (Internal quotation marks omitted.) *In re Abdullah*, 85 Ill. 2d 300, 305, 423 N.E.2d 915, 917 (1981); see also *In re J.B.*, 2014 IL App (1st) 140773, ¶ 61, 19 N.E.3d 1273. Under section 1(D)(i), a conviction for aggravated battery of any child "shall create a presumption that a parent is depraved which can be overcome only by clear and convincing evidence." 750 ILCS 50/1(D)(i) (West 2016). A certified copy of such a conviction creates a *prima facie* showing of depravity. *In re A.H.*, 359 Ill. App. 3d 173, 180, 833 N.E.2d 915, 921 (2005) ("Certified copies of the requisite convictions create a *prima facie* showing of depravity ***."); see also *In re J.B.*, 298 Ill. App. 3d 250, 254, 698 N.E.2d 550, 552 (1998).

¶ 40        A rebuttable presumption has been explained as follows:

"A rebuttable presumption creates a *prima facie* case as to the particular issue in question and thus has the practical effect of requiring the party against whom it operates to come forward with evidence to meet the presumption. [Citation.] The only effect of the rebuttable presumption is to create the necessity of evidence to meet the *prima facie* case created thereby, and which, if no proof to the contrary is offered, will prevail. [Citation.] If evidence opposing the presumption is presented, the presumption ceases to operate, and the case is determined on the basis of the evidence presented, as if the presumption never existed." (Internal quotation marks omitted.) *In re J.V.*, 2018 IL App (1st) 171766, ¶ 180, 115 N.E.3d 1099 (quoting *In re J.A.*, 316 Ill. App. 3d 553, 562-63, 736 N.E.2d 678, 686 (2000)).

¶ 41    On review, respondent bears the burden of refuting the presumption of depravity by clear and convincing evidence. *In re Donald A.G.*, 221 Ill. 2d 234, 253, 850 N.E.2d 172, 182 (2006). To rebut a presumption of depravity, respondent must demonstrate she is rehabilitated. *In re Shanna W.*, 343 Ill. App. 3d 1155, 1167, 799 N.E.2d 843, 852 (2003).

¶ 42              3. *The Trial Court's Finding in This Case*

¶ 43    Here, respondent does not dispute that a presumption of depravity arose based on her conviction for aggravated battery of a child. She contends she overcame the presumption because, between the initial allegations of abuse in 2014 and her subsequent criminal conviction in 2018, respondent "completed all of [her] services and was so satisfactory in her compliance and rehabilitation that the child was returned to her care in October 2016"; "[t]here were never any further additional incidents of abuse, nor were there any concerns by the agency of abuse"; "at the time of the hearing[,] there was nothing on [respondent's] service plan that had to do with addressing the physical abuse"; and therefore, "[t]hose issues had been addressed."

- 12 -

¶ 44        Here, respondent did not overcome the presumption of depravity in that she failed to present clear and convincing evidence she was rehabilitated. Although we acknowledge there were no reported incidents of physical abuse following the December 2014 allegations and that respondent completed her initial service plan goals, we do not find this constituted clear and convincing evidence of rehabilitation in light of other evidence presented at the fitness hearing. First, although respondent had completed her services at one point after the case was opened, the record reflects that she later became uncooperative and was rated as unsatisfactory with her permanency goal when she refused to participate in individual counseling services and work with a parenting coach following the sexual abuse allegations in 2017. Respondent presented no evidence or testimony about what steps she had taken towards rehabilitation other than cooperation with DCFS and participation in services. Mere completion of certain services, without more, is not clear and convincing evidence of rehabilitation. Additionally, the evidence relating to the incident at Dew Chili Parlor further weighs against respondent's contention she is rehabilitated. We agree with the State that respondent failed to present clear and convincing evidence sufficient to overcome the presumption of depravity, and find the trial court's fitness determination was not against the manifest weight of the evidence.

¶ 45                    B. The Best-Interest Determination

¶ 46        Respondent next argues the trial court's best-interest determination was against the manifest weight of the evidence. We disagree.

¶ 47        "Following a finding of unfitness *** the focus shifts to the child. The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D. T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the

parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the proceedings, "the State bears the burden of proving by a preponderance of the evidence that termination is in the child's best interest." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290-91 (2009). We will not disturb the trial court's best-interest determination unless it is against the manifest weight of the evidence. *Id.* at 1071. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d 441, 464, 819 N.E.2d 734, 747 (2004).

¶ 48        Under the Juvenile Court Act, there are several factors a court should consider when making a best-interest determination. 705 ILCS 405/1-3(4.05) (West 2018). These factors, considered in the context of the child's age and developmental needs, include the following:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *Jay. H.*, 395 Ill. App. 3d at 1071 (citing 705 ILCS 405/1-3(4.05) (West 2008)).

¶ 49        Here, in finding termination of respondent's parental rights was in A.Y.'s best interest, the trial court emphasized that stability and permanence were especially important because the case had been ongoing for over five years and A.Y. had spent almost half of his life in

care. McBride testified A.Y. appeared to be well-cared for and was safe and happy in his current placement with his grandmother. A.Y. was doing well in school and had strong bonds with his grandmother and foster siblings. His grandmother also expressed a willingness to adopt A.Y. Although McBride testified that A.Y. had a bond with respondent, she also noted that a parenting coach had to be used at one point due to bonding issues. Finally, the court noted that adoption offered the best opportunity for stability and permanence for A.Y. considering respondent's current incarceration. Given these circumstances, the court's finding that it was in A.Y.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 50                                    III. CONCLUSION

¶ 51          For the reasons stated, we affirm the trial court's judgment.

¶ 52          Affirmed.